The PEOPLE of the State of
Colorado, Complainant,

v.

Victor REICHMAN, Attorney–
Respondent.

No. 90SA485.

Supreme Court of Colorado,
En Banc.

Oct. 21, 1991.

Linda Donnelly, Disciplinary Counsel, George S. Meyer, Sp. Asst. Disciplinary Counsel, Denver, for complainant.

Alex Stephen Keller, Denver, for attorney-respondent.

PER CURIAM.

This is an attorney discipline case. A hearing panel approved the findings and recommendation of a majority of the hearing board that the respondent receive a public censure for conduct involving dishonesty, fraud, deceit or misrepresentation, and conduct prejudicial to the administration of justice. We accept the recommendation of the hearing panel and publicly censure the respondent and order that he be assessed the costs of these proceedings.

I

The respondent was admitted to the bar of this court on October 2, 1973, is registered on the official records of this court, and is subject to the jurisdiction of this court and its grievance committee. C.R.C.P. 241.1(b). At all times relevant to this proceeding, the respondent was the duly appointed or elected District Attorney of the Sixth Judicial District, which includes La Plata County.

The complaint filed by the special assistant disciplinary counsel charged the respondent with violations of DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1–102(A)(5) (a lawyer shall not engage in conduct prejudicial to the administration of justice); and DR 1–102(A)(6) (a lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law).[1] At the hearing, the board heard testimony from witnesses, including the respondent and certain expert witnesses, and received exhibits into evidence by stipulation of the parties. A majority of the hearing board found that the following facts were established by clear and convincing evidence.

In the spring of 1987, the respondent and other members of law enforcement in the Sixth Judicial District formed a *de facto* task force, or "LEADS committee," to conduct undercover operations to investigate

---

**1.** The complaint did not charge the respondent with violating provisions of DR 7–102 (which prohibit a lawyer from making false statements of law or fact or creating or preserving false evidence, and require a lawyer to promptly disclose to a tribunal the fact that a person has perpetrated a fraud on the tribunal); DR 7–103(A) (a public prosecutor shall not institute criminal charges when he knows that the charges are not supported by probable cause); or DR 7–103(B) (which requires a public prosecutor to timely disclose to counsel for the defendant the existence of evidence known to the prosecutor that tends to negate the guilt of the accused). We therefore do not discuss whether these disciplinary rules apply to the respondent's conduct in this case.

and prosecute drug trafficking in the district. A police officer from outside the judicial district was retained to conduct the undercover investigations, and the officer chose the fictitious identity of one "Colton Young," an unemployed biker. The respondent served as the head of the task force.

After several months undercover, "Young" had developed a list of names of suspected drug traffickers in the judicial district. In addition, two individuals had told "Young" that an attorney, Robin K. Auld, accepted drugs in lieu of fees.[2] Then, in September 1987, "Young" called an emergency meeting of the task force to announce that he believed his undercover identity may have been compromised. The task force decided to rehabilitate "Young's" identity. With the respondent's approval, "Young" was "arrested" for a traffic violation on the main street of Durango outside of the business establishment of a significant target of the task force. Auld was not this target. A search of "Young" was then conducted in such a way that the fruits of the search could be easily suppressed and the charges dismissed. "Young" was instructed to contact Robin Auld and retain him as defense counsel. *See People v. Auld,* 788 P.2d 1275 (Colo.1990).[3]

As part of the plan, fictitious charges were lodged against "Young" with the respondent's knowledge and approval. The respondent, either personally or through his agents, filed a false criminal complaint against "Young," charging him with the illegal possession of a firearm and of mari-

huana in the County Court of La Plata County. Other documents filed by or on behalf of the respondent in the "Young" case included a surety bond and an offense report, falsely stating "Young's" name and address, and falsely stating that "Young" had committed certain criminal offenses. In addition, with the respondent's knowledge and approval, "Young" appeared in county court and made false statements to the county judge, who was unaware of the deception.[4]

II

A majority of the hearing board concluded that the respondent's conduct in filing the false documents and the fictitious criminal complaint, and otherwise creating and maintaining the deception of the county court, violated DR 1–102(A)(4) (conduct involving dishonesty or misrepresentation), and DR 1–102(A)(5) (conduct prejudicial to the administration of justice).

The respondent argues that his conduct was not unethical and he points to a number of cases in which prosecutors engaged in deception during "sting" operations, including *United States v. Martino,* 825 F.2d 754 (3d Cir.1987), and *United States v. Murphy,* 768 F.2d 1518 (7th Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986).

In *United States v. Martino,* 825 F.2d 754 (3d Cir.1987), the Third Circuit held that the issuance of a grand jury subpoena to an undercover FBI agent in the pseudonym under which the agent was working was not prosecutorial misconduct. Since grand jury subpoenas are widely recog-

---

**2.** On March 19, 1990, this court suspended Robin K. Auld from the practice of law for six months for his involvement in the occurrences which form the basis for this proceeding. *See People v. Auld,* 788 P.2d 1275 (Colo.1990). The facts recited in the *Auld* opinion were contained in Auld's conditional admission of misconduct, which we accepted. The respondent in this case was of course not a party in the *Auld* proceeding, and thus is not bound by the factual findings therein.

**3.** The actual objective of the "arrest" and the filing of the fictitious charges against "Young" was hotly disputed. The special assistant disciplinary counsel sought to establish that the re-

spondent's intention was to coerce Auld into betraying Auld's client or clients. The hearing board did not find that this was the respondent's design by clear and convincing evidence. For the purpose of this opinion, we assume that the respondent's intention was to rehabilitate "Young's" undercover identity.

**4.** The respondent makes much of the alleged fact that "Young's" statements to the county judge were not made under oath and thus were not testimony. We find such legal hair-splitting immaterial on the question of whether the respondent violated the Code of Professional Responsibility.

nized as instrumentalities of the executive branch for investigatory or prosecutorial purposes, the integrity of the judicial process was not compromised in appearance or actuality by the issuance of the sham subpoena. *Id.* at 761–62. The court of appeals also concluded that issuance of a pseudonymous subpoena by a prosecutor was not the type of outrageous conduct which would constitute violation of the criminal defendants' due process rights. *Id.* at 763.

*United States v. Murphy*, 768 F.2d 1518 (7th Cir.1985), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986), discussed the participation of the FBI and federal prosecutors in Operation Greylord. The defendant in *Murphy*, a former associate judge of the Circuit Court of Cook County, Illinois, was convicted of accepting bribes to fix the outcomes of hundreds of criminal cases that came before him. As part of Operation Greylord, FBI agents posed as corrupt lawyers, and other agents testified in made-up criminal cases heard by Judge Murphy. Murphy argued that his convictions were invalid because the Operation Greylord "cases" were frauds on the court, and the undercover agents committed perjury. The court of appeals disagreed, finding that while the agents' acts appeared criminal, the acts were not crimes because they were performed without the requisite criminal intent. 768 F.2d at 1528–29. Further, *Murphy* held:

> The FBI and prosecutors behaved honorably in establishing and running Operation Greylord. They assure us that they notified the Presiding Judge of the Circuit Court's Criminal Division, the State's Attorney of Cook County, the Attorney General of Illinois, and the Governor of Illinois. Such notice may not be necessary, and certainly a criminal defendant is in no position to complain of the absence of such notice (for he has no personal right to protect the dignity of the Cook County courts), but the notice dispels any argument that the federal Government has offended some principle requiring respect of the internal operations of the state courts.

*Id.* at 1529. Prosecutorial deception may not always constitute prosecutorial misconduct for purposes of determining whether a criminal complaint or indictment must be dismissed. It does not necessarily follow, however, that prosecutorial deception of a type which results in directly misleading a court should be exempted from the proscriptions of the Code of Professional Responsibility simply because the deception is not such as to warrant the dismissal of a criminal case.

In the case of *In re Friedman*, 76 Ill.2d 392, 30 Ill.Dec. 288, 392 N.E.2d 1333 (1979), the attorney-respondent, Friedman, was a state prosecutor. In two separate investigations involving bribery of two police officers, Friedman instructed the police officers to testify falsely in court hearings for the purpose of bringing corrupt attorneys to justice in future criminal proceedings. Four justices of the Supreme Court of Illinois found that Friedman's conduct violated the Code of Professional Responsibility notwithstanding his motives. Two justices found that Friedman's conduct was unethical but did not merit discipline because he "acted without the guidance of precedent or settled opinion and because there is apparently considerable belief ... that the respondent acted properly in conducting the investigation...." *Id.* at 398–99, 30 Ill.Dec. at 291, 392 N.E.2d at 1336 (Goldenhersh, C.J., announcing decision of the court). Two justices concurred in the decision of the court not to impose discipline because they determined that Friedman did not violate the Code of Professional Responsibility. *Id.* at 404–05, 30 Ill.Dec. at 294, 392 N.E.2d at 1339 (Underwood, J., concurring, joined by Ryan, J.). Two justices concluded that Friedman's conduct was unethical and warranted censure. *Id.* at 405–11, 30 Ill.Dec. at 294–97, 392 N.E.2d at 1339–42 (Clark, J., dissenting); *Id.* at 413, 30 Ill.Dec. at 296–96, 392 N.E.2d at 1342–43 (Moran, J., dissenting).

Following *Friedman*, a similar question was raised in disciplinary proceedings in New York. In *In re Malone*, 105 A.D.2d 455, 480 N.Y.S.2d 603 (1984), *aff'd*, 65 N.Y.2d 772, 482 N.E.2d 565, 492 N.Y.S.2d 947 (1985), the appellate division publicly

censured an attorney for his conduct while serving as Inspector General of the New York State Department of Correctional Facilities. During an investigation into the alleged beating of an inmate by several correction officers, the inspector general instructed a correction officer, who was acting as an informant, to lie under oath during an interview conducted in the course of an internal investigation into the beating. 105 A.D.2d at 456–457, 480 N.Y.S.2d at 605. The purpose of the deceit was "to protect [the correctional officer] willing to risk retaliation for breaking the correction officers' 'code of silence'...." *Id.* at 460, 480 N.Y.S.2d at 607–08. The inspector general argued, *inter alia*, that his conduct was not unethical because it was in accordance with ethical canons requiring the competent and zealous representation of clients, there was precedent for the use of false testimony in the investigation and prosecution of crimes, and because his motive to protect the witness outweighed any ethical breach. *Id.* at 457–458, 480 N.Y.S.2d at 606. The appellate division rejected each argument.

First, the court reasoned that the ethical canons requiring competent and zealous representation cannot in themselves overcome the disciplinary rule, DR 1–102(A)(4), which prohibits an attorney from directing another to testify falsely. *Malone,* 105 A.D.2d at 457–458, 480 N.Y.S.2d at 606. Second, while there may be precedent that the creation of false documents and the use of false testimony in the investigation and prosecution of crime may not be so violative of a criminal defendant's due process rights to warrant dismissal of a criminal indictment, such conduct may still be unethical. *Id.* Finally, citing *Friedman,* the appellate division refused to accept the in-

spector general's third argument—that his conduct was not unethical because he was motivated by the desire to protect the witness and by his public responsibilities. This argument is the equivalent of the contention that the end justifies the means, and "that pernicious doctrine," *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting),[5] is unacceptable in the administration of the criminal law. 105 A.D.2d at 457–458, 480 N.Y.S.2d at 606. Noting that the purpose of disciplinary sanctions is not punishment but the protection of the public, and also noting that it was a case of first impression in New York and that the inspector general seemingly acted out of laudable motives, the appellate division imposed a public censure. *Id.* at 460, 480 N.Y.S.2d at 607–08. *See also Nigrone v. Murtagh,* 46 A.D.2d 343, 347, 362 N.Y.S.2d 513, 517 (1974), *appeal dismissed and judgment aff'd,* 36 N.Y.2d 421, 330 N.E.2d 45, 369 N.Y.S.2d 75 (1975) (condemning a prosecutor's filing of fictitious robbery prosecution in effort to investigate allegations of bribery and corruption as "a perversion of the criminal justice system by an overzealous prosecutor" and "illegal, outrageous and intolerable...."); Annotation, *Disciplinary Action Against Attorney for Misconduct Related to Performance of Official Duties as Prosecuting Attorney,* 10 A.L.R.4th 605 (1981 & Supp. 1990).

We agree with the reasoning in *Malone,* and we conclude, as did the hearing panel and the majority of the hearing board, that the respondent's conduct violated DR 1–102(A)(1), and DR 1–102(A)(5). District attorneys in Colorado owe a very high duty to the public because they are governmental officials holding constitutionally created

---

**5.** As Justice Brandeis said in dissent in *Olmstead:*

> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is conta-

> gious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

offices. *People v. Larsen,* 808 P.2d 1265, 1267 (Colo.1991). This court has spoken out strongly against misconduct by public officials who are lawyers. *Id.* The respondent's responsibility to enforce the laws in his judicial district grants him no license to ignore those laws or the Code of Professional Responsibility. While the respondent's motives and the erroneous belief of other public prosecutors that the respondent's conduct was ethical do not excuse these violations of the Code of Professional Responsibility, they are mitigating factors to be taken into account in assessing the appropriate discipline. The respondent has no prior discipline.

We find, therefore, that the respondent's misconduct warrants discipline consistent with our duties to protect the public and maintain the integrity of the legal profession.

### III

Accordingly, we accept the recommendation of the hearing panel and publicly censure the respondent Victor Reichman. While the surrounding circumstances may tend to explain and mitigate the misconduct, they do not excuse the deception imposed on the court. We therefore publicly reprimand Reichman and assess him the costs of these proceedings in the amount of $4,851.28. The costs are payable within ninety days after the announcement of this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 500-S, Dominion Plaza, Denver, Colorado 80202.